**Patricia H. BULLER, Individually and as Legal Representative of the Estate of Paul Buller, Appellant,**

v.

**BEAUMONT BANK, N.A., Appellee.**

No. 09–88–175–CV.

Court of Appeals of Texas, Beaumont.

Aug. 31, 1989.

Rehearing Overruled Sept. 27, 1989.

Marshall C. Rea, Houston, for appellant.

J. Hoke Peacock, Brian L. Plotts, Beaumont, for appellee.

## OPINION

BURGESS, Justice.

This is an appeal from a post-judgment turnover order which ordered appellant to turn over $97,661.24 cash for levy to the Jefferson County Sheriff in partial satisfaction of the judgment appellee obtained in the same proceeding.

 A turnover order where the court intended to exercise control over what was to be deposited, and where no funds would be turned over without further court order, and the amount to be credited for the property to be turned over was left for later determination, is not a final, appealable judgment. *In re Brecheisen*, 665 S.W.2d 191 (Tex.App.—Dallas 1984, writ ref'd n.r. e.). This case is distinguishable in that appellant was ordered to turn over a sum certain in cash for levy to the Jefferson County Sheriff at a specific time and place. All matters involved in the proceeding were resolved, leaving only ministerial duties to be performed; thus the proceedings are final. *Samuels v. Finkelstein*, 25 S.W.2d 923 (Tex.Civ.App.—Beaumont 1930, writ dism'd).

Appellant's first point of error states: "The trial court committed fundamental error in refusing appellant's timely request for separate trial by jury on substantive issues raised in the evidentiary, non-jury hearing." Appellant sets forth as fact issues the existence and ownership of the funds and whether the funds could be reached by a turnover order. Specifically, appellant argued that she held a community property interest in the funds, that she

was entitled to certain exemptions provided by *TEX.PROB.CODE ANN. sec. 286-293* (Vernon 1980), and that the estate fund was exhausted.

*TEX.CIV.PRAC. & REM.CODE ANN. sec. 31.002(a)* (Vernon 1986) aids judgment creditors in reaching property of the judgment debtor that cannot readily be attached and is not exempt. The trial court has jurisdiction to decide if property of the judgment debtor is not exempt. *Pace v. McEwen*, 617 S.W.2d 816 (Tex.Civ.App.—Houston [14th Dist.] 1981, no writ). The judgment debtor is entitled to trial on the merits on disputed fact issues. *Steenland v. Texas Commerce Bank*, 648 S.W.2d 387 (Tex.App.—Tyler 1983, writ ref'd n.r.e.); *United Bank Metro v. Plains Overseas Group, Inc.*, 670 S.W.2d 281 (Tex.App.—Houston [1st Dist.] 1983, no writ). On timely request and payment of the jury fee, the respondent is entitled to jury trial of fact issues, including the issue of the existence of the asset which is the subject of the turnover proceeding.

The record in this cause reflects the motion for turnover relief was filed on November 23, 1987; the attorney for the estate received the motion before December 1, 1987; appellant filed responses to the motion January 7, 1988; the hearing on the motion began January 7, 1988, and was recessed to February 8, 1988, which is the hearing date stated on the order. A jury trial was requested in the response filed January 7, 1988. The jury fee was paid February 18, 1988.

 The right to trial by jury is not absolute but is dependent on written request and payment of the jury fee a reasonable time before the date set for trial of the cause on the non-jury docket, but not less than thirty days in advance. *TEX.R. CIV.P. 216*. The time limitations of Rule 216 apply with equal force to application for jury trial and payment of the jury fee. *Huddle v. Huddle*, 696 S.W.2d 895 (Tex. 1985). Having failed to meet these requirements for entitlement to jury trial, appellant cannot complain on appeal of the court's refusal to submit fact issues to a jury.

■ Appellant's second and third points of error argue that the trial court's findings that the estate is the owner of $97,661.24 cash held by Patricia Buller is not supported by the evidence. The uncontroverted testimony of Patricia Buller and the attorney for the estate was that there was no cash in the estate on the date of the hearing. While there was evidence that Patricia Buller possessed assets and cash in excess of $100,000.00, appellee produced no evidence that as of the date of the hearing the judgment debtor/estate owned or possessed $97,661.24 cash or that Patricia Buller possessed or held $97,661.24 owned or possessed by the judgment debtor/estate. Patricia Buller was not a judgment debtor in her individual capacity; appellee could only obtain an order for her to turn over estate assets. Because there is no evidence of the existence of the asset which is the subject of the turnover, the judgment of the trial court must be reversed.

Reversed.

BROOKSHIRE, Justice, dissenting.

After a hearing on or about March 14, 1988, a post-judgment turnover was issued by the district court in favor of the Appellee Bank to enforce and attempt to collect a judgment against the Estate of Paul Buller, Deceased, and Patricia Buller, as Independent Executrix of the said estate. The trial court signed an order reading in relevant part:

"... [T]hat Patricia H. Buller, Legal Representative of the estate of Paul Buller, and Patricia H. Buller, *Individually,* turn over $97,661.24 cash for levy to the Jefferson County Sheriff at the Jefferson County Courthouse, 1149 Pearl, Beaumont, Texas, on or before *4:00 p.m.* on *March 28th, 1988.*"

This order was suspended as to its enforcement pending this appeal. The Beaumont Bank holds and owns an unsatisfied judgment in excess of the amount of the turnover order.

Mr. Paul Buller died on October 25, 1985. Before his demise, Mr. Buller had incurred $199,553.09 in debt by way of a promissory note to the Beaumont Bank. Mrs. Buller, his wife, was named as independent executrix of the estate in his Will, qualifying as such on November 12, 1985. The estate of Mr. Buller was initially represented by another attorney at law. In the early part of December 1985 the present counselor became the attorney for the estate and Mrs. Buller continued as a personal representative of the estate.

Some time in the early part of December 1985, $99,736.99 was transferred out of an account at the First State Bank of Lumberton into a special trust account of the Honorable Marshall Rea. It is shown that the statement of facts before us are of a proceeding conducted on February 8, 1988. It is also clear that there had been a prior proceeding on this matter conducted on January 7, 1988. It was admitted that on February 28, 1986, the then-attorney for the estate who still represents the estate transferred the then-balance in the State Bank of Lumberton in the amount of $101,590.74 to his personal trust account No. 5. The increase represented interest earned.

On Mrs. Buller's specific instructions the attorney of record on two occasions had transferred money. On December 23, 1985, he had transferred $10,000.00 to the account of Brad and Vicki Mansfield and on February 6, 1986, he transferred $17,000.00 to the account of L & M Motors. There was another transfer of $20,000.00 to the account of L & M Motors on February 20, 1986. These transfers were made on specific verbal instructions from Mrs. Buller.

Some time after February 28, 1986, another series of transfers were made. These transfers were made also in accordance with specific instructions from the executrix. A total of $103,661.24 was transferred by wire from Marshall Rea's trust account No. 5 on the instructions of Mrs. Buller. The expenses of Mr. Buller's last illness were paid out of other funds. With the exception of two attorney's fees, the monies paid out did not have a connection with the estate. They were certainly not used to pay fully the just debts of the decedent's estate. Of significance is an

exhibit in the record that shows in considerable detail how many of the cash disbursements were made. Virtually all of these cash disbursements were made by cashier's check. There were also a number of personal mortgage payments made. Significant and crucial is that phase of the record that clearly discloses that Mrs. Buller had no records or professed to have no records of what happened to the various large sums and funds after they were delivered to her or to her designees.

At the hearing on January 7, 1988, of which we have no transcription of the court reporter's notes, the district court ordered Mrs. Buller to bring any and all records that she had of what happened to the large sums of money, exceeding $100,000.00, after she received these sums or directed their outlays. She was definitely to bring these records to the hearing on February 8, 1988; but she brought only one record or receipt. The $17,000.00 receipt was the only record brought by the Appellant. At the second hearing it was clearly demonstrated that virtually all of the funds of the estate of Paul Buller, deceased, *had been totally unaccounted for*, but totally disbursed. No bank account for the estate had been opened. The record proves that the great bulk of the estate was $100,-000.00 in the First State Bank of Lumberton, patently in the form of a C.D. This $100,000.00 was transferred into Mr. Rea's personal trust account as set out above, the independent executrix having failed to establish a bank account in the name of and for the estate.

From the record it is *glaringly clear that the $100,000.00 in the First State Bank of Lumberton was an asset of the estate of Paul Buller.* It was a C.D. being numbered 3471. In the inventory, appraisement and list of claims of the estate, the executrix Patricia H. Buller swore that these facts were true and correct, *the $100,000.00 C.D. being listed as community property cash.* The record is undisputed that Mr. Rea acted at all times as an attorney for the personal representative of the estate and that the money that was dealt with and disbursed was a community property cash asset of the estate and that

Mrs. Buller was acting in her capacity as executrix. Also clearly established was the fact that the sole and only source of the funds that were transferred into and out of the trust account No. 5 was the C.D. described in the sworn inventory located at the First State Bank of Lumberton which came into the trust account No. 5 at some time in December of 1985.

From the testimony of Mr. Rea, it was disclosed that at several meetings the attorney then representing the Beaumont Bank kept referring to the C.D. money in Lumberton. Mr. Rea felt that there would be a "negotiated way out", he said would not be helpful for the attorney for Beaumont Bank to find out that the money was no longer in the Lumberton bank. At that point Mr. Rea explained to the lawyers and the officials of the Beaumont Bank that Mrs. Buller had withdrawn it and that he was holding it in a trust account in Houston. He also stated that his negotiated position vis-a-vis the Beaumont Bank was that the C.D. in Lumberton had never been pledged to Beaumont Bank and that it was part of the estate and the Beaumont Bank did not have a judgment at that time. These discussions took place most probably at some time in December of 1985 or January of 1986.

Mrs. Buller testified that she understood her duties as personal representative of the estate which included a duty to try to ascertain the liabilities as well as the assets of the estate. Mrs. Buller reaffirmed the fact that the one hundred thousand dollars in the First State Bank of Lumberton was the same money received by Mr. Rea and put into his trust account. And she reaffirmed that the $100,000.00 listed in the inventory was the source of the money put into the trust account No. 5. She was asked:

"Q Now, as far as you know, is there any other money that is listed on that appraisal that went to Mr. Rea?

"A No."

Mrs. Buller also unequivocally swore in a very clear and unmistakable manner that she understood that she had a duty and

was obligated to pay the debts of the estate out of the estate's assets. She also re-affirmed that she had instructed Mr. Rea to make all the transfers, many by wire. These transfers exhausted the entire $100,-000.00.

She testified, for example, that she had instructed the attorney to pay the $10,-000.00 to Brad and Vicki Mansfield, Vicki being her daughter, but the estate did not owe them any money. She reaffirmed the transfers of money to L & M Motors. She swore that that stood for Lyle and Mansfield but again, the estate of Paul Buller did not owe any money to L & M Motors. Then the record discloses this:

"Q What was the purpose of those transfers?

"A I was informed that the Beaumont Bank could come in and seize the account at any particular time and so we had it transferred over to Lyle and Mansfield in hopes that they could continue on with the business."

Mrs. Buller further admitted that there was no debt owed to her by the estate and that she had not contributed any separate property or separate money. She further testified that the money that was sent to her by Mr. Rea was used to pay bills. She first stated that "Paul didn't have insur-ance." She also stated that she couldn't put the money in the bank and she had to pay various bills in cash. Mrs. Buller fur-ther acknowledged that Mr. Rea had sent to her over a period of time a sum of money slightly in excess of $103,000.00. Although she had been instructed to bring her records concerning the money transfer-red to her by Rea, she only brought a document concerning the $17,000.00 that was delivered to L & M Motors.

Examining the witnesses concerning the January 7, 1988, hearing *and the events that happened thereafter* we find in the record:

"MR. REA: I had no personal dealings with her.

"THE COURT: Pardon me?

"MR. REA: I had no personal dealings with her.

"THE COURT: Oh, okay. Whoever.

"MR. REA: I had to locate and organize my records. I informed Pat that we had to account for the money. She said she had no bank accounts. She cashed them. She doesn't have a depository, like I have here, with deposit receipts; that money went mostly into the used car business, and she left that business over a year and a half ago."

Upon further examination of Mrs. Buller we find:

"Q Mrs. Buller, you don't doubt the tes-timony Mr. Rea has given here about the fact that you got the hundred and three thousand odd dollars back from him in the transfers and so forth that we've discussed; is that right?

"A No, I don't doubt it.

"Q You have no reason to disbelieve Mr. Rea's testimony about any of that money?

"A No."

The record proves that the attorney for the probate proceeding is still acting as such and that Mrs. Buller is still acting as the independent executrix and that the es-tate has not been closed. The estate can-not be properly closed because of the out-standing large debt to Beaumont Bank. Mrs. Buller responded:

"Q And did you understand that you were supposed to pay the debts of the estate out of the estate's assets?

"A I did."

The record clearly demonstrates a perfect tracing of the $100,000.00 C.D. in the Lum-berton bank directly into Mr. Rea's person-al trust account No. 5 and thereafter di-rectly into or through the hands of Patricia Buller through her direct, acknowledged commands. The record shows clearly and convincingly if not condemningly that her only defense to the turnover order was that she just didn't keep any records and she didn't know where the $100,000.00 actually ultimately wound up.

By necessary logical implication the Court's opinion simply holds under this unique record that when a $100,000.00 C.D. is an acknowledged asset of an estate and that estate owes a large, unchallenged,

unattached final judgment to a bank, then the independent executrix can effect a complete defense by simply saying in substance "I don't know and I didn't keep any records." Note that the Court's opinion reverses the order of the trial court *holding that no evidence exists to sustain the turnover order.* I vehemently but respectfully disagree.

Furthermore, the record emphasizes that there was some lack of good-will, if not ill-will, that existed between Mrs. Buller and the Beaumont Bank the merits of which were not developed. She did state that she understood how Paul (her deceased husband) "got set up." But no attack was made on the bank's judgment. When Mrs. Buller was asked about receipts, she responded in part:

"A All my receipts? Now, I didn't understand that part. I just thought I was supposed to show that Marshall did have the ten thousand and he did give it to me.

"Q The hundred thousand.

"A I mean the hundred thousand. And then I thought I was to—"

After stating that she had one document concerning the $17,000.00 delivered to L & M Motors, *Mrs. Buller stated that she had no other item or receipt or document to show what she did with the $100,000.00.*

The rule of law is that once the movant has very clearly and in this case conclusively established that both Mr. Rea and Mrs. Buller received the $100,000.00 and it was definitely the property of and an asset of the estate and the $100,000.00 was traceable directly and unquestionably into their hands; then the burden shifted to them to come forward and to prove what they had done with the $100,000.00 and to show that it had been properly applied to the debts of the deceased. Each was a fiduciary or trustee in relationship to the $100,000.00. The record lucidly shows that the transfers were not made to her from personal trust account 5 in her capacity as an independent executrix or as a personal representative. But, rather, the transfers went to her in her individual capacity. These monies were in turn obviously delivered to parties or entities who had no claim upon the decedent's estate. As a fiduciary, Mrs. Buller had a duty and obligation to act in good faith. She had to deal in good faith with the creditors of the estate and with the entities holding judgments against the estate.

Later Mrs. Patricia Buller was recalled to the stand by her own attorneys. Under friendly questioning she again admitted that she had received the money that Mr. Rea had testified to. Then she unashamedly testified that she had spent the money for various and sundry reasons.

"THE WITNESS: Yes, I spent it.

"BY MR. SMITH:

"Q Did you spend all of the money, this hundred thousand dollars, hundred and three thousand dollars, I think it was testified to, that you received back from your attorney, Mr. Rea?

"A Yes, I spent it all.

"Q Is any of this money in any location anywhere?

"A No.

"Q It does not exist; it has been spent; is that correct?

"A It's been spent."

Then we find by Mr. Peacock: (Cross-examination)

"Q Mrs. Buller, do you have any money at all that belongs to you anywhere in the world?

"A In the world?

"Q Yes.

"A In the world?

"Q In the world.

"A That belongs to me?

"Q Yes.

"A In the Caymans.

"Q How much do you have in the Caymans?

"A My insurance money.

"Q How much?

"A I don't know right off. It draws interest. I don't know.

"Q Is it more than a hundred thousand dollars?

"A Yes.

"MR. SMITH: Your Honor, I'm going to object to this line of questioning. What personal assets she has—

"THE COURT: I am going to overrule that, *because we have been trying to get the answer to that question for months and months and months.*

"MR. SMITH: Your Honor, that has been answered.

"THE COURT: Okay. I am going to let him ask the question. I overrule the objection.

"As the question, Mr. Peacock.

"BY MR. PEACOCK:

"Q How much money do you have in the Cayman Islands?

"A I don't know.

"Q Can you tell the court within ten thousand dollars how much you have?

"A No.

"Q When is the last time you received any accounting for the money you have in the Cayman Islands?

"A I haven't.

"Q How much money did you take to the Cayman Islands?

"A My insurance money.

"Q How much was in—

"MR. SMITH: Your Honor, could I have a running objection to this line of questioning?

"THE COURT: You've got an objection to every bit of it, and it is overruled.

"Go ahead, counsel.

"BY MR. PEACOCK:

"Q *How much money did you take to the Cayman Islands to begin with?*

"A *Two fifty.*

"Q *Two hundred and fifty thousand dollars?*

"A *Yes.*

"Q And how is that money invested?

"A We did this already.

"THE COURT: Do it again, Mrs. Buller.

"THE WITNESS: Okay. A.M.I. Trust Company.

"BY MR. PEACOCK:

"Q A.M.I. Trust Company.

"A Uh-huh.

"Q In the Cayman Islands?

"A Offshore.

"Q What is the name of the company?

"A Offshore.

"Q A.M.I. Offshore?

"A Uh-huh.

"Q It's a bank or something in the Cayman Islands?

"A Uh-huh.

"Q And you took this money down there when?

"A I don't remember.

"Q Was it in the summer of 1986?

"A Yes, it was in '86.

"Q So it's been down there ever since?

"A Yes.

"Q I'll hand you what has been marked Plaintiff's exhibit number 1 and, if you would, look at the item that is marked 15 there. It has something to do with A.M.I. Is that the same A.M.I. that you were talking about where this money is?

"A No, that's not the same. That's here in the States.

"Q Are they related?

"A This A.M.I. is in the States.

"Q That is where your house payments are made?

"A Yes.

"Q And they have a related company offshore in the Caymans; do you know?

"A I don't know.

"Q Do you know if there is any relationship between the company or bank that has your house mortgage and the company in the Cayman Islands that has this two hundred and fifty thousand dollars? Do you know if there is any relation between the two?

"A (No response.)

"THE COURT: Do you understand the question, Mrs. Buller?

"THE WITNESS: No, no.

"THE COURT: Ask it again.

"BY MR. PEACOCK:

"Q Do you know if there is any relationship between the company called A.M.I. that you pay your house payments to and the company called A.M.I. Offshore in the Cayman Islands?

"A They're both mine.

"THE COURT: We didn't hear her.

"BY MR. PEACOCK:

"Q They are both yours?

"A Well, the A.M.I. Offshore where I have my money, that's where I have my money at. This A.M.I. here, they have my money here.

"Q Are they related in any way?

"A I'm sure—I guess they are.

"Q Do you know where the A.M.I. that is in the United States is?

"A No.

"Q You don't know what their address is?

"A No.

"Q Do you know what city they are in?

"A No, huh-uh.

"Q You don't know what city they're in?

"A Oh, in Houston.

"Q Do you know what city in the Cayman Islands A.M.I. Offshore is?

"A (No response.)

"Q What city?

"A (No response.)

"Q You know it's in the Cayman Islands; right?

"A Yes.

"Q What city is it in?

"A I'd have to go find it.

"THE COURT: What was the answer?

"MR. PEACOCK: She said she would have to go find it.

"THE COURT: Go find what? The city?

"MR. PEACOCK: I think that's what she said.

"THE COURT: *Mrs. Buller, do you think this is funny?*

"THE WITNESS: No, I don't.

"THE COURT: *Then why are you laughing, Mrs. Buller?*

"THE WITNESS: I can't believe I'm so dumb that I can't think of the name of the city, of the city of Caymens. I can't believe I can't remember the name of that city.

"THE COURT: And you've got two hundred and fifty thousand dollars there and you don't even know where it is.

"THE WITNESS: I know it. Right now, I don't." (Emphasis added.)

I cannot comprehend why the Court wants to absolutely reverse the order when we do not have the complete record before us, since there is no statement of facts concerning the important hearing held on January 7, 1988. *TEX.CIV.PRAC. & REM. CODE ANN. sec. 31.002* (Vernon 1986) cogently provides that a judgment creditor is entitled to aid from a court of appropriate jurisdiction through injunction or other means in order to reach property to obtain satisfaction on the judgment if the judgment debtor owns property. Property is defined to include present or future rights to property that cannot be readily attached or levied upon by ordinary legal processes.

*Section 31.002(b)* specifically provides that the court may order the judgment debtor to turn over non-exempt property that is in the debtor's possession or is even subject to the control of the debtor together with all documents and records relating to the property to a designated sheriff. *Section 31.002(c)* gives the court ample power to enforce this order by contempt proceedings or by other appropriate means. And although the counselors for Mrs. Buller vehemently argue to the contrary, it is clear that *Section 31.002* in its appropriate subsection provides that the court's assistance is obtainable in the same proceeding in which the judgment was rendered or in an independent proceeding. But the independent proceeding is not necessary. See *Norsul Oil & Mining, Ltd. v. Commercial Equipment Leasing Co.*, 703 S.W.2d 345 (Tex.App.—San Antonio 1985, no writ).

It is interesting to note that at oral submission counsel for the Appellant conceded that community debts are properly paid out of community assets. Mrs. Buller has made absolutely no claim for any type of separate property of hers to be considered. See *Cockerham v. Cockerham*, 527 S.W.2d 162 (Tex.1975). The large judgment debt in this instant case definitely arose during the marriage and unquestionably it was a legal, business community property debt.

The Texas Probate Code provides that the community property interest passes charged with and burdened under the debts against it. In fact, *TEX.PROB. CODE ANN. sec. 45* (Vernon 1980) provides in relevant part:

"Upon the dissolution of the marriage relation by death, all property belonging to the community estate of the husband and wife shall go the survivor, if there be no child or children of the deceased or their descendants; but if there be a child or children of the deceased, or descendants of such child or children, then the survivor shall be entitled to one-half of said property, and the other half shall pass to such child or children, or their descendants. But such descendants shall inherit only such portion of said property as the parent through whom they inherit would be entitled to if alive. *In every case, the community estate passes charged with the debts against it.*" (Emphasis added.)

*TEX.PROB. CODE ANN. sec. 156* (Vernon 1980) provides:

"The community property subject to the sole or joint management, control, and disposition of a spouse during marriage continues to be subject to the liabilities of that spouse upon death. In addition, the interest that the deceased spouse owned in any other nonexempt community property passes to his or her heirs or devisees charged with the debts which were enforceable against such deceased spouse prior to his or her death...."

This judgment debt was clearly enforceable against Mr. Paul Buller prior to his death. Moreover, in the same Code, *Section 37* provides:

"When a person dies, leaving a lawful will, all of his estate devised or bequeathed by such will, and all powers of appointment granted in such will, shall vest immediately in the devisees or legatees of such estate and the donees of such powers; and all the estate of such person, not devised or bequeathed, shall vest immediately in his heirs at law; *subject, however, to the payment of the debts of the testator or intestate, except such as is exempted by law....*" (Emphasis added.)

Cogently and compellingly persuasive is the concept that in the partition of the community property estate upon divorce, the Texas courts have consistently ruled that the community property reachable by the creditors during their marriage remains liable, valid and enforceable after the partition of the community estate. See *Anderson v. Royce*, 624 S.W.2d 621 (Tex. App.—Houston [14th Dist.] 1981, writ ref'd, n.r.e.); *Dan Lawson & Associates v. Miller*, 742 S.W.2d 528 (Tex.App.—Fort Worth 1987, n.w.h.).

Our record is completely devoid of any effort or attempt by Mrs. Buller to apply for any type of order before the probate court setting a family allowance under the appropriate Texas Probate Code such as *Section 286.* Importantly, more than a year has passed since Mr. Buller's death. Those applications should have been made to the appropriate probate court and not in the district court or here on appeal. The time for such family allowance has long expired. I would certainly respect and place great weight on the trial court's ruling in the matter, especially in view of the reality that he observed the demeanor, the voice, the actions, the attitudes of the witnesses before him, especially Mrs. Buller.

Certainly as independent executrix, Mrs. Buller had a high fiduciary duty to act for the benefit of and to safeguard both the creditors and beneficiaries of the estate. *TEX.PROB. CODE ANN. sec. 146* (Vernon 1980) clearly and affirmatively mandates that even an independent executor shall classifly, allow, and pay or reject claims against the estate. As independent executrix, Mrs. Buller never rejected the Bank's claim and judgment. From this record it is blindingly lucid that this independent executrix simply paid no heed to the substance of *Section 146.* The general thrust, weight and burden of her testimony was that she had engaged and authorized certain transfers of the funds of the $100,000.00 plus to either conceal them from the Beaumont Bank or to delay, hinder, or defeat the Beaumont Bank in the collection of the

judgment. The $250,000.00 in the unknown city in the Cayman Islands more than not tends to prove that she breached her duty, especially her fiduciary duty, to the estate and to the judgment creditor thereof. The totality of her acts justifies the District Judge's order in all its aspects.

Mrs. Buller does own her community share outright; that share is definitely subject to the community debts against it. See *Janes v. Commercial Federal Savings and Loan Ass'n*, 639 S.W.2d 490 (Tex.App.—Texarkana 1982, writ ref'd); *Bloom v. Bear*, 706 S.W.2d 146 (Tex.App.—Houston [1st Dist.] 1986, no writ).

Furthermore, the turnover statute can be reasonably classified as a remedial one and should be construed in a broad and efficacious sense to assist final judgment creditors in realizing their claims against judgment debtors. A turnover proceeding has been classified as the statutory equivalent of the equitable remedy of the creditors' bills. See *Ex parte Johnson*, 654 S.W.2d 415 (Tex.1983). Cogently compelling and controlling is the undisputed fact that both Mr. Rea and Mrs. Buller testified that there was no question that the funds that went to Mr. Rea's personal trust account No. 5 were actually the property of the estate of Paul Buller, deceased. Mrs. Buller exercised complete dominion and control over the $100,000.00 C.D. She was in a practical, business-like sense in actual receipt of such funds.

The turnover procedure is obviously an aid to judgment creditors in obtaining satisfaction for their debts. *Sloan v. Douglass*, 713 S.W.2d 436 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.). Indeed, the law is clear in our state that the trial court setting in equity may compel a person over whom it has jurisdiction to turn over realty located outside of Texas. See *Miller v. Miller*, 715 S.W.2d 786, 788 (Tex.App.—Austin 1986, writ ref'd n.r.e.). A trial court has been held to have the authority to compel a defendant to turn over any muniment of title to real estate located in Portugal and the trial court order may compel the defendant to turn over all indicia of ownership. See *Reeves v. Federal Sav. and Loan Ins. Corp.*, 732 S.W.2d 380 (Tex.App.—Dallas 1987, no writ). The Dallas Court of Appeals in *Reeves, supra*, wrote:

"Section 31.002(b) of the Texas Civil Practice and Remedies Code permits a court to:

"(1) order the judgment debtor to turn over nonexempt property that is in the debtor's possession or is subject to the debtor's control, together with all documents or records related to the property, . . ."

This very fact situation was the type that the legislature sought to remedy by enacting the turnover statute. In view of the fact that the money is in the Cayman Islands, it is proved that the judgment holder has no adequate legal remedy such as a levy or an attachment or a writ of execution for reaching these funds in a Caribbean bank account. Hence, it would be repugnant and violative as well as eviscerative of legislative intent and, indeed, the legislative enactment of *TEX.CIV.PRAC. & REM.CODE ANN. sec. 31.002* to simply enable Mrs. Buller to defeat the payment of a just judgment of debt by moving the estate's cash to an offshore, out of Texas and out of the United States bank account.

In the instant case there is absolutely no doubt that the funds that went into Mr. Rea's personal trust account No. 5 were the unquestioned property in toto of the estate of Paul Buller, deceased. Mr. Rea and Mrs. Buller so testified repeatedly and Mr. Rea in his capacity as the attorney for the decedent's estate undoubtedly relied and banked on this very fact in dealing with the $100,000.00 C.D. because he knew that the same had been listed under oath in the inventory of the estate. He swore that he relied entirely on direction from Mrs. Patricia Buller in her capacity as legal representative and independent executrix in making the transfers of the $100,000.00 out of his own personal trust account No. 5. Certainly if the $100,000.00 had belonged to an entity or individual other than the decedent's estate, Mr. Rea would have as a prudent attorney required that the proper instructions be given him from any other

person or entity before he would have transferred out of his own personal trust account, to which he had a fiduciary relationship such large sums of cash money. The numerous transfers were not to persons or entities who had any claim against the estate or creditors.

Important is the fact that although Mrs. Buller had been ordered to bring records she completely failed to do so at the second hearing. The trial judge could have certainly considered this behavior. Then for Mrs. Buller to simply take the position that she didn't know what happened to the funds or that they were spent and gone simply lacks merit. She did, however, unequivocally testify that she had over $250,000.00 in cash in an account in the Cayman Islands. Apparently Mrs. Buller's attitude as to the judgment holder and as to the trial court was, in capsule form, a catch-me-if-you-can and get-the-money-if-you-possibly-can, being aware that monies in the amount of a quarter of a million dollars have been moved to the Cayman Islands. This action would certainly have the necessary result of either hindering, delaying, defrauding or preventing the judgment creditor from receiving any relief. Amazingly, she swore that she did not remember to what city in the Cayman Islands she transferred the large sums of cash. But she still retains control and exercises dominion over the quarter of a million dollars. The record is clear that Mrs. Buller has sufficient funds and total control over them in the Cayman Islands to comply with the trial court's order.

Here the promissory note, debt or obligation has been reduced to a judgment; that judgment has not been attacked. It is a final judgment. The funds are available to pay the judgment. It is obvious that the legislature intended to provide a remedy to satisfy the judgment and to prevent the misuse, or concealment of these large sums of money; nor should Texas courts be defeated in their impartial, conscientious endeavors to carry out the legislative will. The legislature clearly intended and the courts of Texas should abide by that intention to the effect that Texas should and can face the twenty-first century and the last decade thereof not as an irresponsible debtor's paradise; but, rather, as a state where just, adjudicated debts and final judgments can be collected under the turnover statute. *Cain v. Cain,* 746 S.W.2d 861 (Tex.App.—El Paso 1988, writ den'd). .

*TEX.R.APP.P. 53(k)* mandates that the Appellant must file the statement of facts. She has not done so; the court reversed, without remand, on only a partial record.

Certainly Mrs. Buller has not shown from her own testimony that the contended for insurance monies, if any part of the quarter of a million dollars was insurance monies, were properly exempt from the judgment held by the bank.